AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Missouri

FILED
DEC 1 3 2017
U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of )
210 RESERVOIR AVENUE )
ST. CHARLES, MISSOURI  63301 )  Case No.   4:17 MJ 3318 NCC
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, __Tucker G. Vanderbunt__, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

210 RESERVOIR AVENUE  ST. CHARLES, MISSOURI  63301

located in the ____Eastern____ District of ____Missouri____, there is now concealed

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 USC §§ 875, 245, 1991 and 1992(a)(1)(b)(1) | Threats, Federally Protected Activities, Entering a Train to Commit a Crime and Violence Against Railroad Carriers |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*
Tucker G. Vanderbunt
Special Agent, Federal Bureau of Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   December 13, 2017

*Judge's signature*

City and state:  St. Louis, MO

Honorable Noelle C. Collins, U.S. Magistrate Judge
*Printed name and title*

AUSA:   MATTHEW T. DRAKE

# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI

IN RE:
MATTER OF SEARCH WARRANT
FOR 210 RESERVOIR AVENUE
ST. CHARLES, MISSOURI 63301

I, Tucker G. Vanderbunt, Special Agent (SA), Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. Your Affiant has been a Special Agent of the FBI for fifteen years and has been assigned to the St. Louis Division of the FBI since 2016. Prior to assignment to the St. Louis Division, your Affiant was assigned to the Washington Field Office, Washington, D.C., of the FBI. Prior to employment as a Special Agent with the FBI, your Affiant was employed in law enforcement for eight years as a Detective Sergeant First Class with the Conyers Police Department, Conyers, Georgia.

2. As an FBI Special Agent, your Affiant is authorized to investigate violations of the laws of the United States of America. Your Affiant is a sworn law enforcement officer with authority to execute arrest and search warrants issued under the authority of the United States of America. Your Affiant is assigned to domestic terrorism matters and is responsible for investigations of federal crimes, to include firearms and violent crime matters.

3. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises knowns a single family residence and any appurtenances to the real property, is located at 210 Reservoir Avenue, St. Charles, Missouri, 63301, hereinafter referred to as the "Premises" further described in Attachment A, for the things

1

described in Attachment B. The Premises is further described as a two story, single family residence with white siding and a gray shingle roof located at 210 Reservoir Avenue, St. Charles, Missouri, 63301. The numbers "210" appear vertically on a white support post to the right of the red door located in the south facing, main entryway. A separate, red walk in entry door is visible further to the right of the main entryway adjacent to a carport attached to the east side of the residence.

4. The object(s) or items to be seized and searched pursuant to the search warrant are identified on Attachment B. They include any and all laptop computers or other electronic devices such as pads, tablets, or phones capable of connecting to the internet identified as belonging to or primarily utilized by Taylor M. Wilson, as well as any and all firearms, body armor, information or reference materials as listed in Attachment B stored at the Premises or present on the property identified as belonging to or under the control of Taylor M. Wilson.

5. The statements contained in this Affidavit are based on documents and statements gathered during the course of this investigation; on interviews conducted during the course of this investigation; and on my experience and background as a Special Agent of the FBI and the experience of other FBI Special Agents as well as other law enforcement officers with extensive knowledge of criminal investigations. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

6. Your Affiant alleges that the facts contained in this Affidavit demonstrate that there is probable cause to believe that TAYLOR M. WILSON has committed the following violation(s) of federal criminal law: 18 U.S.C. Section 875 (Threats), 18 U.S.C. Section 245 (federally Protected Activities), 18 U.S.C. Section 1991 (Entering a Train to commit a Crime) and other

violence against railroad carriers and against mass transportation systems on land, or water, or through the air, 18 U.S.C. Section 1992 (a)(1) (b)(1), (Violence Against Railroad Carriers) by illegally entering a restricted area and engaging the emergency braking system with intent to harm those aboard on an interstate rail service/carrier (Amtrak) engaged in interstate commerce.

7. Your Affiant submits there is probable cause to believe that electronic devices owned, utilized and/or possessed by WILSON and firearms owned or possessed by WILSON have been used for or obtained in anticipation of engaging in or planning to engage in criminal offenses against the United States as set forth in the background detail below.

## PROBABLE CAUSE

8. On Monday 10/23/2017, FBI investigators in Omaha received a report that on 10/22/2017 at approximately 2:00 a.m., the Furnas County (Nebraska) Sheriff's Office (FCSO) in Beaver City, Nebraska, received a 911 call from an Amtrak Conductor who requested law enforcement assistance. An Amtrak train traveling through Furnas County near Oxford, Nebraska, was delayed by a passenger who breached a secure area of the train and triggered an emergency stop control panel, applying the emergency brakes and causing the train to stop in an expedited (emergency) fashion. The passenger was detained by the train engineer and other Amtrak personnel outside the train and local law enforcement was contacted. A Deputy from the FCSO arrived on scene and witnessed Amtrak personnel physically restraining a single, white male later identified as TAYLOR M. WILSON on the ground. Wilson was handcuffed and helped to a standing position by the deputy and asked numerous times if he had any weapons, to which WILSON either would reply to the negative or not respond. During a subsequent search of WILSON's person, the deputy located a fully loaded .38 caliber handgun in WILSON's front waistband and a (fully loaded) speed loader in his front left pocket. WILSON would not tell

3

Amtrak staff if he had any belongings, but passengers on the train identified a backpack belonging to WILSON which contained three additional speed loaders, a box of .38 ammunition, a hammer, a fixed blade knife, tin snips, scissors, a tape measure and a respirator-style (i.e. 3M) mask similar to ones used in construction trades. Wilson did not and would not provide any information to law enforcement and invoked his rights. Amtrak crew members confirmed WILSON had a ticket and was traveling from Sacramento, California to Missouri. WILSON was arrested and charged with state and local offenses including: Use of a Deadly Weapon to Commit a Felony and Felony Criminal Mischief. He was transported to the Furnas County Jail.

9. Upon booking at the FCSO and during an inventory of additional items, WILSON was in possession of: (1) a business card for the NATIONAL SOCIALIST MOVEMENT, P.O. Box 13768, Detroit, MI, 48213, telephone (651) 659-6307, www.nsm88.org; (2) a business card for the Covenant Nation Church, William Davidson, Preacher, Oneonta, Alabama, 35121 with the inscription "Covenant Nation Church of the Lord Jesus Christ. Conquer we must, for our cause is just!"

10. Investigation showed WILSON has no criminal history other than a traffic citation and holds valid Missouri Concealed Handgun permit. Additional inquiries revealed that WILSON was a suspect in a road rage incident in Saint Charles, Missouri, that occurred on 4/16/2016. According to the St. Charles police report, the victim, a black female, stated a white male in a Green SUV pointed a handgun at her while driving eastbound on Interstate 70 for no apparent reason. The victim told police that the green SUV, had license plate AH3K5M. Investigators traced the plate back to Taylor Wilson. During the investigation, Wilson attempted to turn himself into police custody by contacting park rangers at Kiwanis Park in St. Charles. He refused to state the reason why he was attempting to turn himself in to authorities. The St. Charles

Police Department contacted WILSON and WILSON told them he wanted to be charged for an offense but that he had nothing to say without an attorney. The Saint Charles Police Department compiled a photo lineup which included a photograph of WILSON. Subsequently, they unsuccessfully attempted to locate the victim. Thereafter, the matter was placed in inactive status.

11. On 10/30/2017, WILSON's parents, Michael and Ann Wilson, were interviewed regarding their knowledge of WILSON's activities. Michael and Ann Wilson stated that their son lives with ANDREW OLNEY (hereinafter "CW #1") (ANN WILSON's nephew). OLNEY accompanied WILSON, his cousin, on a trip to California to attend a college visit on 10/17/2017, but the meeting was postponed due to California wildfires. TAYLOR WILSON was reportedly returning to St. Charles via Amtrak so he could attend classes on 10/23/2017. Michael and Ann Wilson stated they did not know the address where CW #1 and TAYLOR WILSON live, but they indicated that it is in St. Charles, Missouri. Michael and Ann Wilson stated TAYLOR WILSON had several, legally purchased firearms and a concealed carry permit. They claimed they had never heard of the National Socialist Movement or the Covenant Nation Church and they had never known their son to be involved with drugs or the white supremacist movement. Michael and Ann Wilson stated they had no idea why TAYLOR WILSON would have activated the emergency braking system on the Amtrak train or the nature of his subsequent intentions.

12. On 11/17/2017, WILSON's cousin and roommate, CW #1 was interviewed by the FBI at their mutual residence, the Premises (located at 210 Reservoir Avenue, St. Charles, MO 63301 – the location for which investigators seek authority to search). A Property Database Search for the Premises revealed that the property is owned by Ann S. Wilson, 3208 Lightfoot Drive, St. Charles, Missouri, 63301.

5

13. CW #1 stated that since he moved in with WILSON in June of 2017, WILSON has been acting strange. CW #1 stated WILSON joined an "alt right," Neo-Nazi group that WILSON found while researching white supremacy forums on-line. SW#1 informed investigators that WILSON'S laptop is currently still at the Premises. CW #1 does not know WILSON's friends or other members in the "alt right" Neo Nazi group, but he did briefly meet some of them when they came to the Premises to walk down to Old Town St. Charles.

14. CW#1 reported that WILSON traveled with members of the "alt right" Neo Nazi group to the protests in Charlottesville, Virginia (believed to be the Unite the Right rally in August, 2017 which was reported nationally due to the violent nature of the protests). CW #1 advised he knew a lot of the guys took guns with them, but he did not know for certain if WILSON took anything other than a shield and a bulletproof vest (body armor). CW #1 stated WILSON normally carries a nine millimeter handgun or a .38 caliber revolver on his person. CW #1 also stated WILSON has shown him between twenty and twenty-five guns that he owns, including an AK-47, AR-15's and an M-4 rifle (approximately ten rifles and ten handguns) which were at the Premises.

15. CW #1 stated WILSON has expressed an interest in "killing black people" and others besides whites, especially during the protests in St. Louis. WILSON made statements that CW #1 understood as WILSON representing to CW #1 that WILSON and his white supremacist group were the ones who put up "Whites Only" signs in businesses at an unknown location and CW #1 believes WILSON is serious about killing black people. WILSON told CW #1 about an incident in which WILSON became angry and pointed a gun at somebody while driving down the highway, but no further information was given. This statement by CW #1 is consistent with the

6

general description of the road rage incident reported to St. Charles authorities on April 16, 2016, and reflects on the reliability of CW #1's information.

16. Video and documents from the phone WILSON was carrying at the time of his arrest obtained from the service of a local search warrant depict the placement of a white supremacist banner with the annotation "Hands up don't shoot" is Anti-white fake news – Altright" over an unknown highway and other related postings and videos. Several documents and pamphlets saved on the phone in PDF files, described as "100 Deadly Skills", a series of individual PDF files, each with a skill related to killing people, copies of the "Poor Man's James Bond" vol. 5 by Kurt Saxon, the Ranger Handbook, The Ultimate Sniper by John L. Plaster and other documents were also located in saved/downloaded files on Wilson's phone. Based on your Affiant's experience, the described documents are often possessed and utilized by individuals and groups attempting or planning to commit criminal acts or acts of violence. Additionally, the information and evidence located on WILSON'S phone demonstrates that WILSON uses electronic devices and storage medium.

17. As described above and in Attachment A, this application seeks permission to search for records that might be found on the Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Investigators have been directly informed that WILSON uses his computer for research in eth areas described herein. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

7

## TECHNICAL TERMS

18.    *Probable cause.*  I submit that there is probable cause to believe a computer or storage medium will be found on the Premises.  Similarly, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or

8

delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

19. *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Premises because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where,

9

and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains

10

information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

20. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing

12

that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

21. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

22. Because persons other than WILSON share the Premises as a residence, it is possible that the Premises will contain storage media that are predominantly used, and perhaps

owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

23. In summary, WILSON has recently been involved in a racially motivated, violent incident involving the use of a weapon, namely a firearm. He was also involved in an incident that caused a risk danger and injury to passengers of a commercial carrier, train and railroad system. These incidents occurred with the background of WILSON'S interest, and involvement in, white supremacy and hate group movements and their ideologies. WILSON has travelled to engage in such activities. Moreover, WILSON has also expressed a desire and willingness to engage in, and commit, future acts of violence. As a result, I submit that there is probable cause to issue a search warrant to search the Premises for the items and instrumentalities described in Attachment B and seize the same.

## REQUEST FOR SEALING

24. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly through online forums. Premature disclosure of the contents of this

affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_____
TUCKER VANDERBUNT
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn to before me on December 13, 2017:

_____
HONORABLE NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE

15

## ATTACHMENT A
### PROPERTY TO BE SEARCHED

The property to be searched is described further as a single family dwelling (house) and any appurtenances to the real property, located at 210 Reservoir Avenue, St. Charles, Missouri, 63301. The residence is described as a two story, single family residence with white lap siding and gray shingle roof. The numbers "210" appear vertically on a white post to the right side of the red, main entryway door of the south facing entryway. A separate red, walk in entry door is visible further to the right of the main entryway adjacent to a carport attached to the east side of the residence. There is a small, white detached shed in the backyard with a gray roof.



## ATTACHMENT B

*Property to be seized*

1. All records, evidence, contraband, fruits of a crime, items illegally possessed, or property used or designed or intended for use in committing violations relating to: 18 U.S.C. Section 1991 Entering a Train to Commit a Crime, and other violence against railroad carriers and against mass transportation systems on land, or water, or through the air, and 18 U.S.C. Section 1992 (a)(1) (b)(1), (Violence Against Railroad Carriers), 18 U.S.C. Section 875 (threats), 18 U.S.C. Section 245(b) (Federally Protected Activities), those violations involving Taylor Wilson including:

    a. Firearms, body armor, or destructive devices

    b. Records and information relating violent acts and attempts to commit violent acts undertaken with a dangerous weapon when those acts occur because of the actual or perceived race, color, religion, disability, sexual orientation, gender identity or national origin of any person

    c. Records and information relating to travel, or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air; itineraries, and payments for travel

    d. Records and information relating to the communication of threats to injure or intimidate another person by means by force

    e. Records and information relating to books, pamphlets, fliers, letters or other hard copy or digital media reference or instructional materials advocating or detailing the means or methods of killing or assassinating individuals.

    f. Records and information relating to the identity or location of the conspirators, accomplices, and confederates concerning the violations described above.

    g. Records and information concerning white supremacy, Neo-Nazi or other anti-government, hate, or racially biased groups that advocate crimes of violence and/or acts of violence, to include but not limited to archived web sites, emails, instant messaging applications, texts, photographs or any other information stored in any electronic format.

2. Computers or storage media used as a means to commit the violations described above.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

17

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.